Good morning. Paul Stewart of Kenobe Morton's Oldsman Bear on behalf of Po Sun Hon Company and Allen Kahn. And I think we've raised some fairly interesting legal issues for the Court, and I'd certainly be happy to answer. Let me ask you some questions about the jellyfish case. Yes. Satava? Satava, yes. I think it was. The jellyfish case. Speaking. The way I understood that case is that the basic idea of it was you can't copyright a fact of nature, how a jellyfish looks. And the sculptures were – the Court used the word lifelike. They were lifelike representations of how a jellyfish looks. If I understood it correctly, it was how a jellyfish really looks, the kind of colors you see in nature and everything. Now, this flower, the plumeria flower, as I understand it, it is not the color of the metal gold. Is that right? That's correct, Your Honor, but I think the Satava or Satava case should apply equally regardless of what medium you're working in. Well, it's not the medium that I'm asking you about. Actually, I was put in mind of that Magritte painting. It says – it's a picture of exactly what a pipe looks like that you smoke. And it says, this is not a pipe. And the joke of it is, of course it's a pipe. It's a picture – it's an exact picture of a pipe. And then you realize, oh, no, it's not a pipe. It's a picture of a pipe. But in this case, nobody would look at the jewelry and say, that's a plumeria flower. They would say, that's a piece of gold jewelry in the shape of a plumeria flower. With the jellyfish, if it's really a lifelike representation, someone might very well say, my gosh, how did he figure out how to preserve the jellyfish in that condition in the plastic or glass or whatever it is? But here, nobody would say, gee, look, that's a plumeria flower. They'd say, that's a piece of jewelry that has the shape of a plumeria flower. Different thing from the jellyfish. So I'm wondering if the judge extended the jellyfish case too far. I don't think so, Your Honor. I haven't obviously seen the works that were at issue in the jellyfish case. I don't know if somebody – All I know is what the decision says. Yeah. That's the law of it. It said it's lifelike, but it could very well be that if one was sitting right here, everybody would agree. That's a glass jellyfish. I was thinking maybe limited to lifelike representations, like if this plumeria flower, if it was the same color and it looked just like a real plumeria flower. Well, and again, I think that when you take into account that the medium here is gold, the court's findings, and I don't think they're clearly erroneous, were that it looks as much like a plumeria flower in the medium of gold as you could possibly do. Well, it's – perhaps our older jeweled bee case is closer to the mark. Everybody knew it wasn't truly a nature bee. It was a piece of jewelry in the place, in the shape of a bee with jewels on it, and that's where we start. The jellyfish is maybe a polar position, or the man in the moon case, or Dakin, the dinosaur cases. Yeah, I would certainly agree with that, Your Honor, and I do think that the dinosaur cases, clearly with stuffed animals, nobody's going to mistake those for being real dinosaurs, and they're obviously smaller than real dinosaurs. So I would certainly agree with your comments, Your Honor. Dinosaurs are out of date, but stuffed animals, we have real stuffed animals at our airport, and there are also people that make exact replicas of what a stuffed animal, of what the real animal looks like, and it can be hard to tell them apart. So you couldn't very well tell them, well, I do wolves, you don't do wolves. No, but I think in the dinosaur case, I believe it was Aliota, they were deliberately made to look cute, not like a real dinosaur, and one of the points of the case was, well, in the stuffed animal medium, it is commonplace and routine to make the animals look cute and cuddly, and not necessarily perfectly like-like, but to the extent that the sculpture or plush animal derived its features from the actual animal, there was no copyright protection, and I think here to the extent the jewelry derives its features from the actual flower, which is everything except color, then I think it would apply equally here. What color is a plumeria flower? They come in lots of colors. We had some color photos in the briefs. I think there was one that was mostly white with a little bit of yellow in the middle. I honestly don't remember the colors of the rest of them, but I think they come in a wide variety of colors. And I did also, just as a housekeeping matter, want to confirm that the color copies we sent in a few days after the original brief arrived with the panel, because I think they are much better. They did. Good. And I did want to turn briefly, if I could, to the issue of secondary meaning on the trade dress side. Would you just state in English what you think the applicable test is for this case? For secondary meaning? No, the applicable test for trade dress infringement. But as to this jewelry. Okay. Not just some out in the air. Certainly. There's three parts. There's secondary meaning, there's functionality, and there's likelihood of confusion. We haven't focused on likelihood of confusion on this appeal. So for secondary meaning, I think the test for this jewelry, and this is two little boards here that are produced directly out of the brief, is Cosmos needed to show that the Plumeria flower depicted in each of its pieces of jewelry here, that that flower points uniquely to Cosmos as the source of origin. And as we pointed out in the brief, we have these additional third-party agreed-upon, non-infringing pieces of jewelry out there, also of the Plumeria variety. And we do think that it is simply impossible in this environment for this to point uniquely to Cosmos. Counsel, this went to a bench trial. It went to a bench trial. This did go to a bench trial. I wonder whether we aren't confined, unless they're clearly erroneous, to the judge's finding that the Han flowers did indeed cause consumer confusion and appear to be Wong flowers, and people were buying the Han flowers thinking they were Wong flowers. So the overall trade dress of the Han flowers was like the ironing board covers in the Qualitex case. Well, you certainly are bound by the district court findings to the extent they're not clearly erroneous. Why is it clearly erroneous? They had some evidence. I mean, you could go either way on the evidence, but the judge went that way. No, I don't think so, Your Honor. The affirmative evidence of secondary meaning, that consumers associated this flower shape uniquely with Cosmos, was the testimony of three retailers. And we pointed out in our briefs that the Ninth Circuit, as well as other circuits, have ruled that retailer testimony, that they recognize the work of their own supplier, that that is not evidence of consumer's recognition. Well, there is some evidence in the record from retailers that their customers, that is the ultimate consumer, come in and ask for Denny Wong jewelry. Absolutely, there is evidence that customers ask for Denny Wong jewelry, but that doesn't mean that customers recognize this flower as representative of Denny Wong. It means that Denny Wong is a famous jeweler and has a following. So I don't think that that's evidence of secondary meaning in this piece. I thought they had some testimony that consumers actually mistook the Hans for Wongs. No, I don't believe so, Your Honor. It was testimony that the retailers believed. I think for the most part the testimony was that the retailers believed it was a unique piece, believed it was a fine piece. There was a hint of testimony by one of the retailers that he thought that the, I believe he said that it's recognizable as representing Denny Wong. But no evidence of what consumers thought and no evidence, no survey evidence from consumers and no testimony from consumers, and I don't even believe any hearsay through the retailers from consumers. What about the advertising? I mean, again, there is some evidence that the jewelry was advertised over the course of 11 or 12 years. Yeah. Investments spent in building that name recognition. Yeah, and the evidence is that it was an expenditure, I believe about $50,000 over the course of those years. And there's no evidence of any effort in the advertising to promote the shape of this flower as a trade dress. We mentioned the first brands case in our brief suggesting that if the advertising said, look for the familiar yellow jug, that might create secondary meaning, but just a bare ad for the product does not. I remember there was an identical misspelling, but I can't remember what it was in. That, I believe you're referring to a copyright registration. That was the trademark registration. Copyright registration, I believe. Copyright. Yeah, I think that must be where that was. And I would also point out that, you know, this is a bench trial, not a jury trial. So we are dealing with a clearly erroneous standard, a definite and firm conviction that a mistake has been made, and not whether there is some evidence in the record to support the district court's finding. So I do think we're dealing with a different standard here. It certainly is a deferential standard, but I don't think it's as deferential as substantial evidence. Let me ask you another technical question, sort of. Is aesthetic functionality in or out of this equation? It's in. I don't particularly like the term aesthetic functionality just because it was so discredited over the years, and I think the automotive case that we cited extensively really shed new light on it, that certainly aesthetic features of functional products, they may never be functional, or at the very least they are rarely functional. Okay. I guess my question is intended to be a little bit more discreet, and that is COSMOS suggests that the issue was not brought up at trial and is therefore waived. Do you have a response to that? Absolutely, Your Honor. We brought a motion for summary judgment on functionality. We pointed in our responsive brief to all of the evidence that we presented in the district court that went to functionality. COSMOS proposed findings of fact and conclusions of law on functionality, and the district court made findings of fact and conclusions of law on functionality. I think the law is clear under those circumstances that that's not a waiver. It was an issue both pressed and passed upon below, and either one of those, pressed or passed upon, should be sufficient. How do you deal with functionality when you're talking about a piece of art or a piece of jewelry? It sounds as if the aesthetic is the function. That's the point. The automobile case is a little different animal. I mean, that was a trademark. That was duplicating the trademark because it was pretty. Absolutely, and that's why we think, although we very much like the analysis in automotive, we think the result here should be the opposite. And we cited several cases, and I don't know that the court needs to go this far, but the cases that we think ultimately stand for the conclusion that a work of art does not serve as its own trade dress. The work of art is the work of art. It's either protectable by copyright or not. Here it was protectable to some small extent by copyright, but the work of art itself is performing its aesthetic function by just being. I'm not sure I understand that. Okay. If the color of an ironing board cover can be trade dress because it tends to generate consumer confusion, make them think they're buying Qualitex covers when it's some other company's colors or ironing board covers, why can't the look of a piece of jewelry do the same thing? Well, because I do think there really is a conflict with copyright law here. It becomes a perpetual monopoly when copyright law is supposed to protect things for a limited term. Now, I'm wearing here, not by coincidence, a tie with little pictures of Rodin's Thinker on it with an expired copyright, and the public is free to do this now. The public is free to copy Shakespeare's Hamlet and Michelangelo's David and all of these other things, even though they're each uniquely associated with their original author to this day hundreds of years later. And so I do think, as the Second Circuit said in the EMI case where a song was alleged to be its own trademark, that there is a line, and it can be policed by functionality, genericness, or whatever doctrine the court wants to put it into, but there is a line between copyright and trademark trade dress law. Well, the difficulty I've got is with the Supreme Court in the Walmart case and in the Second Circuit in Yerman, essentially saying, look, when you've got a product design, the real issue is secondary meaning. I mean, that's the ball game. So if a design does over time acquire secondary meaning, that's more important than the intrinsic distinctiveness that in other kinds of loan. There they, in the Second Circuit, ended up saying, well, Yerman hasn't identified any elements. But it didn't say its jewelry is not copyright, is not trade dressable, simply because it's a bracelet. Yeah, and I don't know if that issue was raised in the Yerman case at all. They certainly didn't rule one way or the other on it. But secondary meaning obviously is critical. The holding of Walmart is that the inherent distinctiveness just doesn't apply, and there always has to be secondary meaning for there to be trade dress protection in an actual product. But certainly functionality is also a critical issue whenever you're dealing with a product configuration claim of trade dress. When you're talking about jewelry, does functionality translate to artistic looks? I think, and this is why we ultimately reached the conclusion in our brief, that we thought that trade dress rights really don't fit well with a work of art serving as its own trade dress. Because when you're dealing with it, whether it's jewelry, a sculpture, a painting, whatever you want, is the Mona Lisa a trademark for da Vinci? I don't think it's a protectable one. It may be in sort of a vernacular sense, but I don't think it's a protectable trademark. When an artist prepares a painting, no matter how famous it is and how closely associated it is with him, if the copyright expires or for whatever reason is invalidated or lapses, I don't think that the artist can then come back and say, well, that's my trade dress. There used to be an artist, and I'm sure this must have come up in litigation, there was an artist that was in all the galleries that were open late at night, the tourist galleries in New York named Keene, who did mostly children and occasionally animals with really big eyes. For some reason, people went for that. Is that copyrightable? Is it trade dress? If you saw those big eyes, you'd think, oh, another Keene. Yeah, I think it's certainly copyrightable, but I do not think it would be protectable as trade dress. We did cite a case, I think it was called von Furstenberg Galleries, in which there was a claim that the style of Salvador Dali, which was most certainly distinctive, but that served as his trade dress, and the court ruled against him, I don't know if it was him or his estate, but ruled against him on that claim, on the grounds specifically that they were crossing the line between copyright law and trade dress law. I have 57 seconds. I'd love to save it. Thank you. Mr. Gibson. Good morning. May it please the Court, Stan Gibson on behalf of Cosmos. I'd like to address some of the Court's points. First, with regard to functionality versus aesthetic functionality, the question was asked, was the issue of aesthetic functionality raised below, not the question of whether functionality was raised. Functionality was raised on summary judgment by the defendants, but aesthetic functionality was not. Aesthetic functionality was raised for the first time in the post-trial proceedings. Now, just because the district court then addressed it in deciding those post-trial motions does not make it appealable. So what's the practical, in English, what's the practical consequence in reviewing the opinion, if you're correct? As a practical matter, then we're looking at functionality in terms of utilitarian, the question of was the product a utilitarian product. And we're looking, we're not looking at this as an aesthetic functionality issue in terms of. It's just kind of different from a knife. I mean, this is a piece of jewelry, or pieces of jewelry, whose only reason for being is artistic. It's their visual or appeal, their satisfaction is to be pretty. Well, that may be the proper analysis that should have been raised by the defendants at trial would have been aesthetic functionality, but they didn't raise that issue. When we're looking at that, and that does impact how I tried the case below, and had they raised that, that impacts the type of evidence that I put on. I think even if we look at aesthetic functionality in this situation, after the automotive gold case, we're looking at is there some sort of competitive advantage that's not related to reputation that's being conveyed? And that's the focus. It's on competition. And in the situation we have, and questions of functionality, the case law is uniform, are intensely factual. So the standard is clearly erroneous, and that's not disputed by the defendants. So when we're looking at functionality, the district court judge found that there are numerous ways, there's hundreds if not thousands of ways to depict plumeria flowers in jewelry. And so the fact that we have this very, we have one unique distinctive piece, we've carved that out as part of our market and what we sell to be distinctive so customers will know who's supplying it. Is that size sensitive too? Yes. Is that size sensitive? That is also size sensitive. It has to be size sensitive? So if somebody makes a plumeria a little bigger than your piece, then that's not infringing Lanham Act law? I think it depends on what's confusing to the consumer at that point and what the secondary meaning is. That wasn't our case because the pieces here are virtually identical in shape. So we didn't have to address that issue. But if someone makes a very large plumeria flower, and the consumers are not associating that with us and are not confused by it, then that would not be useful. Now, your evidence that consumers associate plumeria flower with you, could you sort of go through that a little bit? I understand the case and say, well, we do a lot of advertising and that's good enough. I'm not really asking that question. I'm asking a different question, real, on-the-ground evidence that when the consumer sees that thing, he goes, gosh, that must be by Mr. Wong. And there was evidence from the jewelry store owners. And the jewelry store owners both are purchasers and sellers themselves. So they are a consumer as well because they do actually purchase the product. Some have it on consignment, but some actually purchase it. Let's talk about real people on the ground and not jewelry store owners for a moment, okay? The jewelry store owners testified that their consumers come in and ask for Denny Wong plumeria jewelry. That doesn't answer the question I asked you. That doesn't even come close. I mean, I can go in and ask for Radio Shack something or other. That doesn't tell me that whenever I see a something or other, I think, Radio Shack? That's a different question. Sure they come in and ask for that. Everybody goes in and says, I want Kellogg's X. That's not the same thing as saying that every time I see an X, I think of Kellogg's. It seems to me it's confusing because that's all I know. Do you have any evidence that people say, I just saw a plumeria flower. That must come from Denny Wong. Well, we have that. Do you have any of that evidence? In some of that, there was evidence of confusion between the ñ that is the retail store owners again. They didn't challenge the likelihood of confusion on appeal. The other side defendants did not raise that on appeal. There was evidence at the trial from Mr. Wheeler. Now, it's not part of what we submit as the record because they didn't raise that on appeal, the issue of confusion. But Mr. Wheeler testified he was aware of a consumer coming in and being confused between Mr. Hahn and Mr. Wong's pieces. So there was evidence of actual confusion from that standpoint, but they didn't challenge that on appeal. They challenged only secondary meaning. And in terms of secondary meaning, I think one of the important aspects to look at is this ñ is the line of plumeria. What Mr. Wong did is he created a unique ñ he created a unique piece of jewelry, and then he used that as his signature in a line so that people would just ñ would go in. Counsel, I'm having problems with this. I don't think ñ well, suppose you're trying to buy an Apple computer or Mac or an iPod or some other piece of equipment made by Apple. They've got a distinctive color. They always have their own color for a period of a couple of years, and they have their distinctive type font. That looks like trade dress. I don't think Danny Wong ñ or I can't remember if it was Danny. I may be thinking of another case. I don't think Wong can tell people nobody else can ever make gold plumeria flower earrings. And as far as how different they'd be, gold is heavy. The size of an earring is limited by what the earlobe can comfortably hold. You can't ñ I don't think that there's anything distinctive about gold earrings the way there is about Apple's color and type font that makes you think that it comes from Wong, except that over the years there have been a lot of Wongs. I actually have an easier time with your copyright theory than your trade dress theory, even though the district court went the opposite way because of our jellyfish case. Wouldn't this mean nobody else can make plumeria flower gold earrings? No, it would not, Your Honor, because Mr. Wong used a particular sandblast finish, which you can see in the pictures, and a high-polished raised edge, along with a particular shape and the gold jewelry. And when the defendants show you that picture of non-infringing pieces that they say are close, they do not fall within the trade dress because they don't have that sandblast finish. Some of them have diamond cuts in the middle. That's not Mr. Wong's trade dress. It is very distinctive in the marketplace, and that's what all the evidence went to. In terms of the copyright ñ So you're saying what makes a trade dress is it's not just a gold plumeria earring. It's matte leaves, shiny edges. It's more than just that. It's a particular sandblast finish. Mr. Wong chose from hundreds of different ways he could do that sandblast finish. He has a proprietary mixture of sand grains that make that finish, and that's exactly what the defendants copied. They copied that entire look and feel of the sandblast finish, the raised polished edges, along with doing the jewelry in gold and in that shape. Does that mean when I buy a smoking pipe, if it looks like a Dunhill because it's a sandblast, like a Dunhill sandblast, then it must be a trademark violation? They have a limited number of shapes, and depending on what quality of briar it is, either they polish it smooth or they sandblast it, basically. Well, there may not be enough choices there. I don't know. I'm not a smoker, so I don't know the pipe context. But in terms of if there's enough different ways to do it so that it's not functional and there's enough secondary meaning. There are different ways to do it, but they look very, very similar to everybody, but piping. Then perhaps, yes. They also have to establish secondary meaning, and they also have to establish the likelihood of confusion, which we did below. Can you just say precisely what the elements of your trade dress are? The elements of the trade dress are a particular shape of the jewelry with a gold finish with the sandblast matted petals and the high polished raised edge on the petals. And that particular kind of sandblast finish is what is claimed. Okay. You're familiar with the Yermak. Yes. Okay. So there the Second Circuit says several things, one thing being, well, it doesn't cut it to just say you've got an artistic combination with some other things. And I would say that if there's any piece of jewelry in the world that's readily identifiable as coming from a particular source, it would be David Yerman jewelry. And they said that didn't suffice. So what is it about your flower that you say would distinguish this case and the opinion we would write in your favor in this case from Yerman? There's two distinguishing points from Yerman. Number one, in Yerman they failed to do what I just did. They could not articulate what their trade dress was. That's true, and I'm going to get to that in one second, but that's the first one. All right. And the second point is that they did not have a registration, and we have a registration. The only effect of that, of course, is just to shift the burden of proof to the other side. What has to come out is the same. It does shift the burden. It shifts the burden, but it was noted specifically in Yerman that they did not have a registration. I understand. And that is a distinguishing factor between our situation and theirs. Okay. And I should have mentioned a third. I apologize, Your Honor. We did have a bench trial, and Yerman I do not believe was after a trial. So we have clearly erroneous findings where we did put on evidence, and the court had the opportunity below to inspect the actual pieces of jewelry, to hear from the jewelry designers, to hear from third-party witnesses. Okay. Now, if we take your elements and you analyze it the way the Second Circuit analyzed a design product, analyzed jewelry, at the end of the day, you still have a question of whether the product design is generic. Right? So why is it that the elements that you just identified aren't generic? Because the flower is the flower. The finish is a common finish, both for the matte finish and the highlight, a solid, shiny gold. I have a pen that I'm wearing today that has exactly that finish, and it's been around for decades. It's generic. So why do you not have a generic problem? Well, it's not generic, and the district court specifically found below that it was not because that matte finish, that sandglass finish, there is nothing like it on the marketplace other than the defendant's infringing product. There was nothing like it before, and there was nothing like it after. And that is then used in combination with that raised … Not just to have a matte finish. So what you're saying is it is the particular matte finish. Absolutely, Your Honor. There were hundreds of ways to do a sandglass finish or a matte finish, and he … Aren't there different ways to accomplish the same thing? If you want to enhance contrast in a black-and-white photograph, one way to do it is to use a higher contrast paper. Another way is to stretch out how long you keep it in the developer. And a third way is to make it just slightly light and use selenium toner. The viewer who isn't a pro or a serious amateur can't tell the difference. It just looks like a little more contrast. Aren't these matte finishes the same thing, just craftsmen and artists deciding how to generate a nice matte finish so you can separate the petals with your eye from the edges? But in the jewelry industry, and there was a lot of testimony of this at trial, there are hundreds of ways to do that, and they create different looks and feel to the pieces. And that's what made … The way he did his made his piece distinct and original, and that was what the testimony was. I do want to briefly turn to the copyright issue and the issue with Satava, because I don't think the district court did apply Satava or the Scenes of Fair Doctrine correctly here. Well, but that's not really – I mean, it's Rosenthal is the key case to deal with, isn't it? That is an important case as well in terms of the bee pens, but again … Well, what's closer, jellyfishes that are in a sculpture or a pen that's an animal, like a pen is your flower? Well, I think that both are not close to our case for a couple of different reasons. First, one of the questions was asked is, what does the plumeria flower look like in nature? Because a bee is a bee, and you do a bee with jewelry, you only have so many different ways to do it. Bees and wasps? It looks like a bee. Yellow jackets? Well, but those are particular different kinds of insects, and you're copying the work of nature. Indeed, there are zillions of bees. Well, they're … A bee is not just a bee. I mean, exactly. Well, I don't want to impugn the bees, so let me move to the flowers. The flowers themselves, the plumeria flower in nature … Could anyone tell on a piece of jewelry whether it's a killer bee or a nice little honey-making bee or anything like that? I'm sure an expert could. I'm not sure that I could, Your Honor. But the point is, the question that Your Honor asked about these plumeria flowers in nature, they are never just a single color. They're multicolored, and there's pictures of them in the record. And so they do not look like the plumeria jewelry that my client designed. In fact, we had a botanist expert who examined the jewelry pieces and said, if he were to look at this jewelry and if he were to give a student instruction to duplicate the plumeria flower, who would give him my kind of advice? It doesn't look like a bee either. I mean, but what we said is, a bee is a bee. It's in nature. It's just there. And you can't make it copyrightable by putting jewels on there in any particular way. You just can't do it. But this does not replicate nature in the slightest of ways. It is a completely different aspect of the blossom. If you look at the actual blossoms in nature, they don't look like my client's plumeria designs. He's not copying in nature. Well, I understand that. It inspires. Have you ever seen a green bee? So you can make a bee pen out of emeralds. There may be one. I don't know. I'm no expert either. But I doubt that there are any green bees. But you can't copyright that either. But it's a question. He did much more than just take a plumeria flower and make it gold. Again, it's the way that he shaped the petals. They don't look like that in nature. There's no diamond in the middle. There's nothing that replicates that in nature. We've got the sandblast finish, which is not part of the natural aspect. And it's looking at those combination of elements the district court didn't do. The district court ignored that combination to say this is an original work of art that deserves protection. And that is what's different than the bee case or the jellyfish case. This is not something that had to be done if you're going to replicate a flower. There were hundreds of different ways to do this. In fact, there are many, many different plumeria pieces. And the district court said fine. But it didn't say you can't copyright your flower. It just said because it's like the bee situation, to get somebody for infringement, you're going to have to be very precise. It's going to be virtually precisely like your flower. That's what Rosenthal said. You can have all kinds of jeweled bees. Of course, if the person absolutely copies precisely Rosenthal's jeweled bee, that's a different question. But jeweled bees can't be copyrighted. Correct? Well, the district court went wrong, though, was applying the scenes of fair doctrine to say there were only stock ways to do this particular piece of jewelry. And that was not correct. And in doing that, the district court excluded the matte finish and the high polished raised edges from the comparison. If you include that, then the pieces are virtually identical. We had lots of evidence that they were strikingly similar. And that's what the district court did wrong. If someone did the same thing but he put a pearl instead of a diamond in the middle, would that be okay? In terms of the copyright violation, I still believe that would be a copyright violation. That would still be substantially similar in terms of the copyright violation. If I might reserve the last minute, I'll ask a question. You don't have time to reserve. Well, I think he – are you expecting to respond to the cross appeal in a minute? I was. Okay. I think you are expecting to now argue the cross appeal, and then we'll get back to you. I think that's what he was expecting. Could we give him a little more time? I'd really like to hear Ferdinand's question and the answer. It's not him. He was after it. Okay. He's going to argue the cross appeal. I was going to do the cross appeal and rebuttal all in 54 seconds. Just real quickly on the functionality issue and waiver, I was glad to hear Mr. Berman agree that functionality generally was raised below. It's true we didn't rely on the automotive analysis specifically at trial. That decision came down the day after judgment was entered, so we couldn't rely on the specific analysis of automotive. Mr. Berman did say that the parties used the same sandblast finish, and I think if you look at the district court's findings, the court specifically found that while we both used a sandblast finish, the exact grade and type of sand used was different and created a slightly different surface appearance. I also wanted to address the comment that it doesn't replicate nature. We discussed that a little bit before, but I did want to point out that the court found that it did replicate nature in its copyright findings, and that finding wasn't clearly erroneous. Even the matte finish, the testimony of their own expert was that a plumeria flower has quite literally a matte finish. That's the exact words that he used. We pointed that out in our brief. Why don't you just take a minute or so on the cross-appeal issue, because I know we want to talk to Mr. Gibson about damages. Sue, would you like me to address the damages issue? Okay, because that wasn't the cross-appeal, but I'm happy to address damages. I do think that the burden of proof here, what we cited in the Supreme Court and Ninth Circuit case law, is clear that the plaintiff has the burden of coming forward with some evidence. Why didn't they do that? I mean, the evidence is not much, but it's some, and there wasn't anything on the other side. The evidence they came forward with was two binders of invoices, which they admitted covered my client's entire business. There's a rule that says if you can't separate it out, then you get the whole thing. No, I don't think that's the rule, Your Honor. I think the rule is if you can't separate out the portion of a product that was due to infringement versus the portion of the same infringing product that wasn't due to infringement, then you get the whole thing. That's what I meant. Yeah, but these are hundreds and hundreds and hundreds of sales of different products, and I don't think there's any case law relieving the plaintiff of his burden to point out which products infringe and which products don't. Where you have a play and only five minutes of the play infringe and you're trying to figure out, well, should I charge the whole ticket price to the defendant or only a portion of the ticket price, the defendant is stuck if he can't apportion that out in some fashion. But where there is hundreds and hundreds of pieces being sold, the plaintiff fundamentally bears the burden of pointing out which pieces were sold that were infringing and which pieces were not. We agreed in our brief that there's some room for an equitable distribution where an invoice is illegible, but here, by the witness's own admission, no effort whatsoever was made. You know, it seems funny to me to deal with this by burden of proof, frankly, because I thought, well, there's plenty of discovery and there's plenty of lawyer's fees going into it. I would have expected both sides to hire experts who'd go through these tedious invoices, make spreadsheets, and say, here's the number. No, here's the number. Yeah, I was in trial counsel. I don't know why damages experts weren't hired. My client, Mr. Hahn, did testify as to his accounting. The district court, in her discretion, rejected that testimony. I thought it was lying. She can't do anything about that. Yeah, she didn't credit it, I'll put it that way. But what we're left with then is a stack of invoices, testimony as to what the totality of the invoices is, but no testimony as to which products in those invoices infringe. Okay. Thank you, Mr. Stewart. You're very welcome. Mr. Gibson on damages. With respect to the damages issue, the reason why this was a problem was because the only way you could use the invoices and separate them out was if you had the item numbers. The item numbers for the jewelry, my client purchased four items. We later learned that 250 were made and destroyed. That's a difficulty. You know, I mean, she had trouble reading it or deciphering it or whatever. But I don't understand at some very fundamental level how you can justify getting damages on non-infringing sales. I mean, that's the rule. You get damages on non-infringing sales. And you could show gross profit on non-infringing sales, which would then cause the infringer to come in and say, no, no, no, no, no. I mean, I get to deduct this and deduct that, whatever. But I just don't get how you can pocket money that has nothing to do with infringing sales. Because he made it impossible to determine what was infringing a sale and what was not, because he went out to the marketplace and melted down all of the infringing pieces so we couldn't tell what the item numbers were. Wait a minute, counsel. You've got things in invoices that were apparently counted that say things like ring phoenix, pendant dragon, cylinder pendant of peace and tranquility. I can just read those. Are you saying, oh, well, those are plumeria flowers too? I'm saying that we don't know because if he put a plumeria blossom on one of those pieces, he went out and destroyed that evidence. And if he put our plumeria blossom on any of those pieces, it would be infringing. But it's his job to tell us that he didn't do that. Otherwise, we're entitled to assume that those are infringing. Wait a minute. You're saying if the invoice says it's a dragon that you're entitled to damages because he might have a plumeria flower on the dragon, even though there's no evidence that he does? Well, because he destroyed the evidence, Your Honor. The burden needs to shift to him to come forward and prove the difference. I don't know if this is a clean spoliation case. Gold has a lot of value. And if there's any risk that what he's doing is violating your copyright and trademark rights by selling the gold in one form, melting the gold and making some other kind of jewelry about it, it seems like an innocent and appropriate activity rather than spoliation. Well, he went out into the marketplace, though, without telling us and pulled back any of the infringing pieces and then melted them down knowing that we had requested them in discovery. Do you have any evidence that he had plumeria flowers on his pendant dragons? We do not know whether he did or not. I'm asking if you have any evidence that he did. I mean, it seems to me you at least have to show infringement. Do you have any evidence that he had them on this cylinder pendant of lasting peace and tranquility? No, we do not, Your Honor. But I don't agree with when the burden of the defendant chooses to keep their books and records in such a way as to make it impossible for the plaintiff to determine what the infringing sales are and what are not. What's impossible about that? We don't know what that piece is. That was how we don't know whether what was. Well, how would you keep a record that would demonstrate that, that would satisfy you? He has to put, whenever he sells something, and we know he sold all kinds of things. He didn't just sell you flowers. So whenever he sells a pendant dragon, he has to put parentheses for your record keeping, parentheses without a plumeria flower on it. Otherwise, any pendant dragons are going to have to be counted, too. Is that your point? Well, my point is, in discovery, we asked him for the information, gross revenues on the infringing sales. He couldn't give us that information. Instead, he gave us all of the invoices. And what are we supposed to do at that point to determine which are infringing and which are not? We don't have all of the pieces because he went out and melted them all down. If we had those pieces, we could have taken those numbers and then compared them to the invoices. This isn't like Lindy Penn where the information was available. If somebody had committed, let's say, a really clean violation of copyright, pirated CDs, wouldn't the appropriate thing for them to do be to buy them all back and destroy them? Well, I think the appropriate thing would be to buy them back and to turn them over to the other side, particularly when there's a discovery request pending requesting them, at least to provide one sample of each. Instead, he took the position, I only sold the four pieces that your client purchased. He then changed it and said, I actually made 250 pieces. The problem with giving them to you is it's not worthless stuff like the pirated CDs where there's no way to reuse the materials. It's gold, and gold is a metal that is commonly melted down and shaped into things, and it has a lot of value independent of whatever piece it had been crafted into. But then let us inspect them, and let us make notes about the numbers. We have them for one day, and we're finished with them. We take pictures, we make notes on the numbers. I've done that in many cases. We never had that opportunity. So you wanted him to give you every piece of jewelry he ever made? I wanted him to give me... A copy of every piece. Well, I guess every piece of jewelry he ever made, wouldn't it be? We asked for him to give us a piece of the infringing pieces that had our plumeria jewelry we contended were infringing, and instead of doing that, he went out and pulled them back from the jewelry stores and melted them down. He didn't take pictures. He didn't write down what they were or anything. Did you have any evidence from his jewelers that he had dragons with plumeria flowers on them? We did not put that type of evidence in, Your Honor. So if you said, give me the pieces that you infringed, and he went out and he got the infringing pieces and melted them down, right? Then what you would conclude from that is anything he ever sold was infringing because now we can't tell, although he's still out of the pieces of things out on the market. Is that right? Did you go on the market and see if there were any dragon pendants out on the market? I think it's really a question of burden, Your Honor. At that point, he should have gone through his invoices and told us what was infringing and what was not, and he could have testified to that, but he was found not to be credible because he was trying to avoid discovery and to destroy evidence. The district court specifically found that he was trying to hide and destroy evidence, and this is a consequence of that kind of conduct. Counsel, thank you. We have used up a lot of your time, but appreciate it. And the matter just argued will be submitted. The court will stand in recess. All right.
judges: Fernandez, Rymer, Kleinfeld